IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DeANDRE BALLARD,

    Plaintiff,

v.

RUTH KINGOO ET AL.,

    Defendants.

Civil Action No.: BAH-24-2763

**MEMORANDUM OPINION**

In response to Plaintiff DeAndre Ballard's amended complaint (ECF 5), Defendants Claudia A. Howard and Abuzahed Jahed filed a motion to dismiss (ECF 19) and Defendants Ruth Kingoo, Marie Anoma, Mandi Hart, and Sherry Duncan filed a motion to dismiss or alternatively for summary judgment (ECF 21). Ballard opposes both motions and has filed motions for appointment of counsel (ECF 17, ECF 32, ECF 34) and for default judgment (ECF 25). Plaintiff subsequently filed a "supplement" to his complaint, *see* ECF 35, to which Drs. Howard and Jahed responded, *see* ECF 40.[1] No hearing is necessary to resolve the matters pending. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons that follow, Defendants' motions shall be granted, Ballard's motions shall be denied, and the amended complaint as to the unserved Defendants shall be dismissed pursuant to 28 U.S.C. § 1915A.

---

[1] Defendants also filed a motion to stay the proceeding pending resolution of certain issues in *In Re Tehum Care Services, Inc. (f/k/a Corizon Health, Inc.)*, Case No. 23-90086 (CML), a bankruptcy case involving the former employer of all defendants in the U.S. Bankruptcy Court for the Southern District of Texas (Houston Division). *See* ECF 39. Given the Court's decision on the merits, the motion to stay is denied as moot.

## I. BACKGROUND

### A. Amended Complaint

Ballard, who is currently incarcerated at Eastern Correctional Institution ("ECI"), is suing medical care providers who treated him while he was confined at Maryland Correctional Institution-Hagerstown ("MCIH"). He states that each of the named Defendants is liable for his injuries because between 2021 and 2023 he complained about a "big lump or tumor growing on the back of [his] neck to all of the defendants." ECF 5, at 4. Ballard acknowledges being seen by each of the Defendants and states that each of them told him he would be sent to an outside hospital, but he alleges that he was never sent to the hospital. *Id.* He claims he was made to suffer in "constant pain everyday" and was "only given [an] antibiotic one time" which "did nothing to help with the pain nor did it reduce the big lump." *Id.* at 4–5.

In Ballard's view, the failure to send him to an outside hospital for treatment of the lump on the back of his neck amounts to deliberate indifference to a serious medical need in violation of his Eighth Amendment right to remain free from cruel and unusual punishment. *Id.* at 5. As relief he seeks one-million dollars in damages from each Defendant for pain and suffering. *Id.*

### B. Defendants' Response

Defendants Drs. Abdul Jahed and Claudia Howard assert that the amended complaint is, at best, a medical malpractice claim that fails to describe how they, or any other Defendant, directly or indirectly acted to deny him medical evaluation or treatment for the condition on his neck. ECF 19, at 3–4. As such, they maintain the amended complaint fails to state a claim upon which relief may be granted. *Id.* at 5. Further, they assert that, as a malpractice claim, Ballard has failed to satisfy the necessary conditions precedent to filing such a lawsuit, requiring its dismissal. *Id.*

Defendants Kingoo, Anoma, Hart, and Duncan provide medical records purportedly disproving Ballard's claim that he has received no treatment for the lump on the back of his neck. *See* ECF 23. The medical records demonstrate that the first time Ballard complained about a lump on the back of his neck was during a sick call on March 5, 2022, when he was seen by Sherry Duncan, a registered nurse at MCIH. ECF 23-2, at 3. Duncan's physical examination revealed that the lump looked like "a fat pad to the base of his neck" with "no redness or open area noted." *Id.* At that time, Ballard was able to move his head from side to side and to look up and down. *Id.* Duncan advised him to keep an eye on the lump and to put in another sick call if he noticed it getting bigger or if it started to drain. *Id.* Ballard allegedly verbalized his understanding of that advice and left for his housing unit. *Id.*

Ballard returned after complaining of a "big knot to back of [his] neck" on March 31, 2022, and he was seen by Evans Budu, RN. ECF 23-1, at 34. Budu noted no tenderness to the back of Ballard's neck, no pain with movement, intact sensation, no spasms, normal range of motion, no weakness, and no tingling or numbness. *Id.* The "large lump" was discolored and swollen but did not appear to require emergent medical care; Budu referred Ballard for routine follow-up with a provider, Erwin Aldana, MD. ECF 23-2, at 2.

On May 3, 2022, Ballard was seen for a Provider Chronic Care Visit by Dr. Jahed. ECF 23-1, at 27–31. Ballard's need for chronic care was required for his diabetes, GERD, and chronic pain due to degenerative joint disease (DJD) of the knee joints. *Id.* at 27. Dr. Jahed noted that Ballard came to the clinic with a lump in his lower neck that started three months prior and gradually increased in sized with associated pain. *Id.* At this time, Ballard could not straighten his neck and the lump measured 5 x 10 cm and was tender. *Id.* Ballard had already been sent to

the Meritus ER for a CT scan with contrast of the soft tissue and the recommendation was to prescribe Keflex for possible cellulitis while a detailed report of the CT was pending. *Id.*

The May 3, 2022 CT scan report from the Emergency Room at Meritus Medical Center describes the lump on Ballard's neck as a "[p]rominent subcutaneous fat of the posterior scalp and neck, with inflammatory stranding and overlying skin thickening." ECF 23-3, at 9. The report also notes that that the "findings likely reflect cellulitis" but no "abscess or suspicious mass" was identified. *Id.* Additionally, Ballard's cervical lymph nodes were mildly enlarged which was attributed to a possible reaction to the cellulitis. *Id.* A neurological examination performed at the hospital was normal. ECF 21-3, at 6 ¶ 16. The neurologist, Dr. Botta, "explained it was unclear why the patient was gaining weight, but it did not represent an acute life threat." *Id.*

On May 17, 2022, Ballard was seen by Dr. Aldana for a follow-up regarding the lump on the back of his neck. ECF 23-1, at 23–26. Dr. Aldana noted that the "swelling [had] significantly gone down, with the redness/erythema and tenderness resolving." *Id.* at 23. Ballard was told to finish the course of antibiotics he had been prescribed; his request for a 2400 calorie a day diet was discussed in the context of his diabetes; his medication for cholesterol regulation (Lipitor) was adjusted; and, upon his request for stronger pain medication for his lower back, knees, and both feet, Naproxen was added to his medications. *Id.*

Ballard was next seen on June 10, 2022 for a "Provider Chronic Care/Sick Call" where he reported that the Keflex he had been prescribed for the cellulitis diagnosis of the lump in the back of his neck had improved the pain at first, but the pain and swelling was continuing. ECF 23-1, at 18. Ballard also complained of pain in his feet, which Dr. Jahed noted appeared to be due to neuropathy. *Id.* There does not appear to have been any plan discussed or formulated in response to Ballard's complaints voiced during this visit. *Id.* at 18–22.

4

On July 18, 2022, Ballard was seen by Mandi Hart, RN, for a Nurse Sick Call visit due to his complaints that he had been on the list to see the provider for months, he had been hurting "real bad," and he had been given antibiotics which caused the cellulitis to decrease "a little bit" but he claimed it was still there and still hurt. ECF 23-1, at 15. Ballard threatened that if he was not seen "asap" he was going to file an administrative remedy procedure complaint ("ARP") on medical staff. *Id.* Hart noted that Ballard had been on the list to see a provider that day but had to be rescheduled because the doctor was not there, which she states she explained to Ballard. *Id.* at 16. Ballard had also expressed concerns regarding having his toenails cut and he was told that a provider would need to do a consultation for podiatry. *Id.* She notes that Ballard expressed his understanding and left in no apparent distress. *Id.*

Approximately two hours after Ballard saw Mandi Hart at Nurse Sick Call, he was seen for a Provider Chronic Care Visit by Dr. Mahboobeh Memarsadeghi. ECF 23-1, at 10–14. The follow-up on Ballard's neck infection notes that he still has difficulty with the range of motion ("ROM") of his neck, that he is obese, and has a "hump." *Id.* at 10. Dr. Memarsadeghi states that the "area is tender to palpation" so she ordered a different antibiotic for ten days. *Id.* She noted that Ballard did not have a fever and sounded understanding when she explained the plan of care to him. *Id.*

On August 28, 2022, Ballard was seen by Razia Sebuliba, NP, for a Provider Visit to discuss a change in his diet. ECF 23-1, at 5–9. At this time Ballard reported a twenty-pound weight gain over the past few months with associated increased abdominal girth, melasma, and "dorsal cervical fat pad associated with discomfort with ROM." *Id.* at 5. Sebuliba ordered a "24-hour urine for Cortisol level" to rule out Cushing Syndrome as a cause for the hump on Ballard's neck. *Id.* at 7.

In a declaration attached to the motion to dismiss or for summary judgment, Ruth Kingoo, NP, explains that "a dorsal cervical fat pad (also known as a buffalo hump) is a buildup of fat in

5

the upper back between the should blades." ECF 21-3, at 8 ¶ 21. The cause is attributable to several possible conditions or medications, "including Cushing syndrome, which is a disorder that causes excess cortisol production that can lead to fat deposits in the neck." *Id.* Kingoo explains that the syndrome "can be cause by an adrenal tumor, lung tumor, or long-term use of glucocorticoid medications." *Id.* She adds, presumably as an alternative cause for Ballard's condition, an observation that "[a] condition called lipodystrophy is a disorder with how the body stores, uses, and makes fat." *Id.* However, no definitive cause is offered for Ballard's condition.

On September 18, 2022, Ballard was seen by Mandi Hart for Nurse Sick Call for his continued complaint of a painful lump on the back of his neck. ECF 23-1, at 2–4. Ballard explained that he had seen "Dr. Razia Sebuliba, NP about this lump on back of my neck" and wanted to see her again because "she was the only one who knew how to help [him]." *Id.* at 2. Ballard said the lump still hurt. *Id.* Hart noted that although a "24 hour urine to check cortisol level was recommended," no order for the test was noted. *Id.* at 3. Because Ballard continued to report the lump was painful and his chronic care medications were due to expire soon, Hart referred him to a provider for medication renewal and "eval/order of testing." *Id.* Ballard indicated he understood and returned to his housing unit. *Id.*

When Ballard was seen on September 30, 2022, by Dr. Aldana for a Provider Chronic Care Visit, no mention was recorded of the lump on the back of Ballard's neck nor of the 24-hour urine test to rule out Cushing's Syndrome. ECF 23, at 31; ECF 23-1, at 1. There is no evidence in this record that this test was ever actually performed.

On December 5, 2022, Ballard was seen again by Dr. Aldana for a Provider Chronic Care Visit to address his allergies. ECF 23, at 26–30. At this visit, Dr. Aldana noted that Ballard continued to have "neck pains secondary to swelling on right posterior neck, upper shoulder." *Id.*

6

at 26. Dr. Aldana noted that Ballard had a muscle spasm on the right side of his neck and that his ROM was mildly reduced. *Id.* at 28. He diagnosed Ballard with Cervicalgia and ordered x-rays as well as "lab work." *Id.* The x-ray showed no acute fracture and minimal multilevel degenerative changes. ECF 23-3, at 21–22.

On January 9, 2023, Ballard was seen for a scheduled provider visit with Dr. Aldana to address the lump on the back of his neck. ECF 23, at 22–25. At that time, Ballard explained that he "has had this lump for a few years" and has "noted the lump to be growing." *Id.* at 22. Ballard also described feeling "pressure symptoms and shooting pains to his shoulder, arms and lower back." *Id.* Dr. Aldana noted that the two courses of antibiotics had not resolved the issue and that the lump was now 16 cm by 12 cm and was "tender to deep palpation." *Id.* He described the lump as beginning at the "back of neck extending down upper back." *Id.* Dr. Aldana assessed the lump as "most likely Lipoma" and noted that Ballard "will need referral to Surgery." *Id.* at 24. Dr. Aldana submitted a referral for general surgery, requesting the earliest available location to evaluate Ballard for surgical excision of "large mass, lump" on the back of his neck. ECF 23, at 19–21, *see also* ECF 23-3, at 25–34.

On January 13, 2023, Utilization Management ("UM") denied the surgical evaluation referral, stating it was "unable to determine necessity with the information provided." ECF 23, at 18. The report, completed by Megan Dubrawsky, RN, also noted that "[l]ipoma is a benign condition and surgical removal is not routinely needed." *Id.* It was recommended that Ballard's providers "[c]onsider reevaluation to obtain pertinent neurologic evaluation." *Id.*; *see also* ECF 23-3, at 23–24. UM did not specify what further neurologic evaluations would include, nor is it evident that UM had at its disposal all of the prior test results (CT scans, etc.) obtained for Ballard's condition.

7

Dr. Memarsadeghi saw Ballard on February 13, 2023, for a Provider Chronic Care Visit during which the lump on the back of his neck was apparently not discussed. ECF 23, at 12–17.

On April 11, 2023, Marie Nguimbus, RN, prepared paperwork for Ballard's transfer from MCIH to ECI, documenting his medical conditions and the medications he was taking. ECF 23, at 7–11. Ballard received no further medical care at MCIH following his transfer to ECI.

In her declaration Defendant Marie Anoma, RN, states that she was employed at MCIH from April 6, 2021, through June 22, 2022, and although she saw Ballard three times in 2021, he never complained about a lump or mass on the back of his neck during those visits. ECF 21-5, at 1–2 ¶¶ 2, 5. Rather, she states that she saw Ballard in the infirmary on June 16, 2021, for a three-day sleep study for sleep apnea and he never complained about a lump on the back of his neck. *Id.* at 2 ¶ 6; *see also* ECF 23-2, at 20–21. She also saw him on October 30, 2021, and records reflect that Ballard "had no complaints." ECF 21-5, at 2 ¶ 6; *see also* ECF 23-2, at 5 (noting that "no complain[t was] voiced" during Ballard's October 30, 2021 visit).

C.  **Ballard's Pending Motions**

1.  Motions for Appointment of Counsel (ECF 17, ECF 32, ECF 34)

Ballard asserts in each of his motions that he is generally uneducated and not skilled as to the law; that he has a colorable claim; and his incarceration adversely impacts his ability to litigate this matter as he cannot leave the prison to interview witnesses or conduct discovery. *See generally* ECFs 17, 32, and 34. A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). There is no absolute right to appointment of counsel; an indigent claimant must present "exceptional circumstances." *See Miller v. Simmons*, 814 F.2d

962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by *Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel); *see also Jenkins v. Woodard*, 109 F.4th 242, 248 (4th Cir. July 22, 2024) (affirming that "a district court must conduct a fact specific, two-part inquiry to assess whether a case presents exceptional circumstances before it decides whether to appoint counsel" including "whether the plaintiff has a colorable claim" and "considering the claim's objective complexity and the plaintiff's subjective abilities, whether the plaintiff lacks the capacity to present it" (internal quotations omitted)). Exceptional circumstances include a litigant who "is barely able to read and write," *Whisenant* at 162, or clearly "has a colorable claim but lacks the capacity to present it," *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008) (citing *Waller v. Butkovich*, 584 F. Supp. 909, 947 (M.D.N.C. 1984)). Since Ballard fails to present a colorable claim and appointment of counsel will not further his cause, his motions for appointment of counsel are denied.

    2.    <u>Motions for Default Judgment (ECF 18, ECF 25)</u>

In his first motion for default judgment, Ballard asserts that Defendants were in default because they failed to file a response to his amended complaint by January 25, 2025. *See* ECF 18. He dates his signature and the certificate of service January 25, 2025. *Id.* In his second motion for default judgment, Ballard asserts that Defendants are in default because they failed to file a response to the amended complaint by February 19, 2025. *See* ECF 25. He again dates his signature and the certificate of service on the date the response was due, February 19, 2025. *Id.*

Defendants Jahed and Howard were granted an extension of time to and including February 24, 2025, to respond to the amended complaint. *See* ECF 14. Their motion to dismiss was filed

on February 13, 2025 (ECF 19), so they did not default and responded in a timely manner. Defendants Kingoo, Anoma, Duncan, and Hart were granted to and including February 17, 2025, to respond to the amended complaint. ECF 16. On that date, they filed their motion to dismiss, or in the alternative, for summary judgment. *See* ECF 21. Under Fed. R. Civ. P. 55(a) default may be entered "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." There has been no failure to plead in this case, therefore Ballard is not entitled default judgment and his motions seeking that relief are denied.

## II. STANDARD OF REVIEW

### A. Motion to Dismiss

Defendants Abdul Jahed, MD, and Claudia Howard, MD, have filed a motion to dismiss the amended complaint against them. ECF 19. In reviewing the complaint pursuant to a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States*, 120 F.3d 472, 473 (4th Cir. 1997). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

The Supreme Court of the United States explained a "plaintiff's obligation to provide the "grounds" of his "entitlement to relief" requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). Nonetheless, the complaint does not need "detailed factual allegations" to survive a motion to dismiss. *Id.* Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### B.   Summary Judgment

The motion filed by Defendants Kingoo, Anoma, Hart, and Duncan (ECF 21) is construed as one seeking summary judgment.[2] Summary Judgment is governed by Fed. R. Civ. P. 56(a)

---

[2] These Defendants move for dismissal or for summary judgment. A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011), *aff'd* 684 F.3d 462 (4th Cir. 2012). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has notice that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When a movant expressly captions its motion to dismiss "in the alternative" as one for summary judgment and submits matters outside the pleadings for the Court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the Court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261; *see also Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 657 (D. Md. 2021) ("Notably, 'the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion.'" (quoting *Ridgell v. Astrue*, Civ. No. DKC-10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012))). Ballard has been on notice that Defendants seek summary judgment since the filing of the motion on February 17, 2025, *see* ECF 21, and after

11

which provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion since, "[b]y its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247–48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The Court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). The Court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

---

receiving the Court's Rule 12/56 Notice, which was mailed on February 18, 2025, ECF 22, at 2. *See* Fed. R. Civ. P. 12(d) (noting that if a court is going to treat a motion to dismiss as one for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion"). As such, the dispositive submission of Defendants Kingoo, Anoma, Hart, and Duncan will be treated as a motion for summary judgment under Federal Rule of Civil Procedure 56 because materials outside the original pleadings have been considered.

12

### III. ANALYSIS

#### A. Defendants Drs. Jahed and Howard

The amended complaint does not include any direct allegations against Dr. Jahed or Dr. Howard. Pursuant to 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, deprives him "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g., Filarsky v. Delia*, 566 U.S. 377, 380 (2012); *see also Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see also Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

"The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245. To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Loftus v. Bobzien*, 848 F.3d 278, 284-85 (4th Cir. 2017); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). Here, Ballard identifies his Eighth and Fourteenth Amendment rights as being violated by "all the defendants" because they did not provide him with the medical care he was promised. ECF 5, at 5. Other than naming Dr. Jahed and Dr. Howard in the caption of the amended complaint and vaguely alleging that they, like all

13

Defendants, are "liable for his injuries," *id.* at 4, Ballard has not raised any specific allegations against them sufficient to allege that either has violated a constitutional right. *See Ervin v. Corizon Health*, Civ. No. ELH-19-1666, 2020 WL 2490042, at *22 (D. Md. May 13, 2020) (finding that a complaint failed to state a claim against a specific physician assistant because "it contain[ed] no specific allegations against him" and, "[e]ven in his opposition, plaintiff simply focuse[d] on generalized claims leveled at the entire 'medical team' involved in his care"). The motion to dismiss shall therefore be granted in favor of Dr. Jahed and Dr. Howard.

For these same reasons, the amended complaint will be dismissed as to the unserved Defendants Sedik Ali and Evans Budu pursuant to 28 U.S.C. § 1915A, which requires this Court to screen prisoner complaints and dismiss any that are "frivolous, malicious or fail to state a claim upon which relief may be granted . . . ." Here, Ballard notes a troubling and no doubt painful medical issue—the growth on his neck—however, he attributes no specific wrongdoing to Ali or Budu. Rather, he simply adds them to a list of the named defendants. The amended complaint is dismissed as to Ali and Budu.

### B.   Defendants Kingoo, Anoma, Duncan, and Hart

Ballard claims that from 2021 to 2023, he complained about a lump on the back of his neck, alleges that Defendants said they would send him to the outside hospital but never did, avers he was only given one course of antibiotics (which did not help his condition), and alleges that he was generally denied treatment for his specific medical needs. ECF 5, at 4–5. Defendants Kingoo, Anoma, Duncan, and Hart have provided medical records and declarations refuting Ballard's assertions that he has not received appropriate medical care in violation of his constitutional rights.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976);

*see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834–37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious

15

medical condition. *See Farmer*, 511 U.S. at 839–40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

Even assuming that Plaintiff's condition represents a serious medical need—after all, it unquestionably caused him great discomfort—summary judgment is nonetheless warranted. The records submitted, which Ballard does not dispute despite knowing they are offered in support of a motion for summary judgment, *see* ECF 29, establish that when medical staff became aware of the lump on Ballard's neck in March of 2022, they began providing a course of treatment for him—including sending him out to the hospital and placing him on two courses of antibiotics. Ballard was sent out to the Meritus Medical Center Emergency Room where he was given blood tests and a CT scan, and ultimately received a diagnosis of cellulitis. ECF 23-3, at 1–3. This was the first time Ballard was prescribed Keflex, an antibiotic. *Id.* at 4. When Ballard complained that the lump still hurt after he had finished the first course of antibiotics, he was prescribed another course.

16

ECF 23-1, at 10. Although there was some consideration of surgically removing the lump from Ballard's neck, a more conservative approach was chosen because it was determined that the lump was likely a benign lipoma. ECF 23, at 18 (noting that "[l]ipoma is a benign condition, and surgical removal is not routinely needed"); at 24 (noting that the mass was "most likely [l]ipoma").

"Importantly, this Court has consistently held that deferral of surgery in favor of conservative treatment alone does not amount to deliberate indifference." *Alvarez v. Wexford Health Sources, Inc.*, Civ. No. PX-17-00141, 2020 WL 2526573, at *4 (D. Md. May 18, 2020) (collecting cases). The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *United States v. Clawson*, 650 F.3d 530, 538 (4th Cir. 2011) (emphasis added) (quoting *Bowring v. Godwin*, 551 F.2d 44, 47–48 (4th Cir. 1977)). "[A]n inadvertent failure to provide adequate medical care" does not amount to deliberate indifference." *Estelle*, 429 U.S. at 105–06; *accord Anderson*, 877 F.3d at 543 ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause."). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)); *accord Jackson*, 775 F.3d at 178 ("[W]e consistently have found such disagreements to fall short of showing deliberate indifference."). To the extent that Ballard disagrees with the decision not to provide him with more invasive medical care, such as surgery, his claim fails to state an Eighth Amendment claim against Defendants Kingoo, Anoma, Hart, and Duncan. Plus, the referral for surgery made by Dr. Aldana was actually denied by UM, who is not a defendant in this action, and Ballard was then transferred to another prison before any of these

17

Defendants had a chance to follow up on the recommendations made by UM, or to resubmit the request with more detailed information. While the Court does not wish to minimize the significance of Ballard's pain and encourages him to actively seek care at his new institution, summary judgment is warranted here because there is no dispute of material fact presented on the key question of whether the remaining Defendants were subjectively reckless in treating or failing to treat Ballard's serious medical condition. *See Farmer*, 511 U.S. at 839–40.

## IV. CONCLUSION

By separate order which follows, the amended complaint will be DISMISSED as to Defendants Jahed, Howard, Ali, and Budu. Summary judgment will be GRANTED in favor of Defendants Kingoo, Anoma, Duncan, and Hart. Ballard's motions for appointment of counsel and for default judgment will be DENIED. The motion to stay will be DENIED as MOOT.

August 28, 2025  
Date

/s/  
Brendan A. Hurson  
United States District Judge